**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| GUNAPT DEVELOPMENT, L.L.C., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )          Case No. 4:20-cv-1778-MTS |
| | ) |
| PEINE LAKES, L.P., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion for Summary Judgment, Doc. [87], on Plaintiffs'

Second Amended Complaint, Doc. [48], pursuant to Federal Rule of Civil Procedure 56.  For the

reasons set forth below, the Court denies in part and grants in part Defendants' Motion.

The Court begins by mentioning the complexity of this case, one where several different

entities entered into a series of complex real estate transactions governed by several interrelated,

written agreements.   Plaintiffs Gunapt Development, LLC ("**Gunapt**" or "**Developer**") and

Gunapt I, LLC ("**Gunapt I**") (collectively, "**Plaintiffs**") filed this action asserting seven claims

against six Defendants relating to the development of a construction project and the subsequent

sale of that project.  The parties operated under several unique but intertwined agreements.  These

agreements are complex and lengthy and form the basis of majority of the disputes between the

parties.  Contract interpretation is at the forefront of this dispute.  Plaintiffs claim Defendants owed

them monies from Plaintiffs work on the project and instead of paying Plaintiffs as the contracts

required, Defendants devised a scheme to deprive Plaintiffs of their monies.  Defendants contend

the contracts allowed them to take the actions that they did such that Plaintiffs are not entitled to

payment as a matter of law.  The Court concludes several material facts remain in dispute, thereby

precluding summary judgment on some of Plaintiffs' claims.

1

## I.    BACKGROUND

Defendant Peine Lakes, LP (the "**Partnership**") was formed for the purpose of constructing and developing a multifamily apartment complex called the Estates of Peine Lakes in St. Charles County (the "**Project**").  The Second Amended and Restated Agreement of Limited Partnership (the "**Partnership Agreement**"), Doc. [89-3], governs the Partnership.  Incorporated into the Partnership Agreement are related agreements including: (1) the Collateral Assignment of General Partner Interest and Deferred Development Fee (the "**Collateral Agreement**"), Doc. [89-6]; (2) the Amended and Restated Development Agreement (the "**Development Agreement**"), Doc. [89-5]; and (3) the Development Deficit Guaranty Agreement ("**DDGA**"), Doc. [89-7].  The Partnership Agreement, Development Agreement, Collateral Agreement, and DDGA were all executed on January 13, 2006.

Also on January 13, 2006, Gunapt I, lent the Project $1,000,000 for the purpose of financing a portion of the development costs (the "**Gundaker Loan**"), pursuant to a Partnership Loan Agreement and Partnership Loan Promissory Note (collectively, the "**Loan Agreements**"), Docs. [89-10], [89-11], and bonds on the Project were increased in the amount of $1.25 million to complete the construction and development.

When the Partnership was formed, Gunapt Peine GP, LLC ("**Prior GP**")—an affiliate of Plaintiffs—was the General Partner of the Partnership.  Defendant Related Corporate Partners XXVI, LP[1] ("**LP**") was the Limited Partner, and Defendant Related Corporate XXVI SLP, LLC (the "**SLP**") was the Special Limited Partner of the Partnership.

The Partnership Agreement named Gunapt as Developer of the Project, responsible for overseeing all aspects of the Project's construction and development.  Gunapt's rights and

---

[1] Related Corporate Partners XXVI, LP's name changed to Centerline Corporate Partners XXVI LP. Doc. [89] ¶ 7.

obligations as Developer were set forth in the Development Agreement.  *See* Doc. [89-5].  One such right—which is the subject matter of all of Gunapt's claims—is that Gunapt would receive a development fee ("**Development Fee**") for its services.  The Development Agreement provided that the Development Fee was to be paid in accordance with the Partnership Agreement.  *Id.* at 5.

In late 2007 or early 2008, the City of Wentzville issued occupancy permits for all of the buildings at the Project.  Beginning in April 2009, the Partnership failed to make monthly payments due under a loan agreement between the issuer of millions of dollars of bonds, dated February 1, 2004 ("**Bond Loan**"), Doc. [89-13].[2]  Beginning in April 2010, the Partnership also failed to make required deposits to fund taxes, insurance, and a replacement reserve.

In 2010, Prior GP agreed to transfer its General Partnership interest in the Partnership to an affiliate of the SLP.  Defendant 2010 Peine Road LLC ("**New GP**") was formed to assume the role as General Partner of the Partnership.  Plaintiffs contend that they and Andrew Weil, on behalf of the "Related" entities, had an oral agreement ("**2010 Oral Agreement**") that as a condition Prior GP would agree to step down as General Partner, Gunapt would retain its right to the Development Fee, and that the Gundaker Loan would remain payable to Gunapt I.  On September 22, 2010, the SLP removed Prior GP as General Partner of the Partnership and made New GP the General Partner, pursuant to the Amendment to Second Amended and Restated Agreement of Limited Partnership ("**2010 Amendment**").[3]  *See* Doc. [89-4].

In 2011, the LP loaned the Partnership around $1.7 million.  In 2013, the Project reached "Stabilization," a financial metric defined in the Bond Loan and related agreements.  That same

---

[2] Plaintiffs do not dispute that the Partnership failed to make monthly payments under the Bond Loan, but instead, disputes that those missed payments are characterized as "Development Deficits."

[3] The 2010 Amendment expressly provides that except for changes specifically referenced in it, the "Partnership Agreement is unchanged."  Those unchanged and reaffirmed provisions include Section 4.6 of the Partnership Agreement (triggering the Collateral Assignment) and Section 14.9 (the merger and integration clause).

year, Defendant Alden Torch Financial LLC ("**Alden Torch**") acquired the Project and the Defendant entities.  Annual certified audit and financial reports for the Project showed that the Development Fee was owed to Gunapt as well as the Gundaker Loan continuously through 2017 and early 2018.  *See* Doc. [94-2] at 78–118; Doc. [101] ¶ 11; *see also* Doc. [94-2] at 70–77.

In March 2018, approximately eight years after Prior GP was replaced as General Partner of the Partnership, the SLP served "notice" on Plaintiffs that Gunapt's interest in the Development Fee was being assigned and that Gunapt I forfeited its right to repayment of the Gunmaker Loan, in accordance with the Collateral Agreement.  Doc. [89-14].  On April 8, 2018, the SLP assigned the Development Fee to New GP.  In October 2018, the Project sold for $20,000,000.  After the Project was sold and the proceeds were distributed, the New GP received the portion of the Development Fee that could be paid,[4] and those funds were then immediately transferred into the operating account of Defendant Centerline Affordable Housing Advisors LLC ("**Manager**").  The sale netted proceeds were insufficient to repay any portion of the Gundaker Loan.

To date, Gunapt has not been paid the Development Fee and accrued interest, and Gunapt I has not been paid the principal and interest on the Gundaker Loan.  Plaintiffs assert the sale of the Project was in the works before the 2018 "notice" to Plaintiffs, in an effort to prevent Development Fee and Gundaker Loan payment to Plaintiffs so that Defendants could take the monies for themselves.

Plaintiffs[5] filed this action asserting seven counts against six Defendants for: breach of contract—the Development Fee (Count I) by Gunapt against the Partnership and New GP; breach

---

[4] Although the principal amount of the Development Fee was $2,547,209.00, the remaining available proceeds from sale of the Project only amounted to $2,393,789.  Doc. [89] ¶ 64.  Section 9.2(B) of the Partnership Agreement dictated the order in which proceeds from the sale of the Project were distributed, and the Development Fee was to be paid eighth.  *See* Doc. [89-3] at 57.

[5] Plaintiffs were entities operated by the real estate company Gundaker Commercial Group ("Gundaker").

of contract—the Gundaker Loan (Count II) by Gunapt I against the Partnership and New GP;

accounting (Count III) by Plaintiffs against all Defendants, except Alden Torch; unjust enrichment

(Count IV) by Gunapt against all Defendants, except Alden Torch; constructive trust (Count V)

by Plaintiffs against all Defendants; tortious interference (Count VI) by Gunapt against New GP,

the SLP, LP, and Manager; and civil conspiracy (Count VII) by Plaintiffs against all Defendants,

except Alden Torch.  *See* Doc. [48]; Doc. [73] (adding Alden Torch as Defendant).  Defendants

now move for summary judgment on all claims under Federal Rule of Civil Procedure 56.  Doc.

[87].

## II.  LEGAL STANDARD

"A court must grant a motion for summary judgment if the moving party shows that there

are no genuine disputes of material fact and that it is entitled to judgment as a matter of law."

*Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  The movant bears

the initial burden of explaining the basis for its motion, and it must identify those portions of the

record that demonstrate the absence of a genuine issue of material fact.  *Torgerson v. City of

Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude" summary judgment.  *Wierman

v. Casey's Gen. Stores*, 638 F.3d 984, 1002 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986)).  A party will not withstand summary judgment with "[m]ere

allegations, unsupported by specific facts or evidence beyond [his or her] own conclusions."

*Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007).  But, where sufficient evidence supports a

factual dispute, it is up to the jury to resolve the dispute at trial.  *Liberty Lobby*, 477 U.S. at 248–

49.  The court views any factual disputes in the light most favorable to the nonmoving party.  *Scott

v. Harris*, 550 U.S. 372, 380 (2007).  The moving party may also discharge its burden by showing

there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is "entitled to a judgment as a matter of law." *Id.* at 323.

## III.   DISCUSSION

### A.  **Breach of Contract (Counts I–II)**[6]

In Count I, Gunapt asserts a breach of contract claim against New GP and the Partnership for failure to pay the Development Fee.  In Count II, Gunapt I asserts a breach of contract claim against New GP and the Partnership for failure to repay the Gundaker Loan.  Defendants argue Plaintiffs are not entitled to payment of the Development Fee or repayment of the Gundaker Loan.

Plaintiffs breach of contract claims are premised on two occurrences.  First, that Defendants failed to timely pay Gunapt the Development Fee prior to the SLP's assignment of the Development Fee in 2018.  Second, that Defendants failed to pay Gunapt the Development Fee when the Project sold.

Defendants move for summary judgment on Counts I and II based *only* on the validity of the SLP's assignment of the Development Fee in 2018.[7]  Specifically, Defendants argue that when Prior GP failed to fund "Development Deficits" that allegedly arose in 2009 and 2010, the SLP had the right to assign the Development Fee from Gunapt and repayment of the Gundaker Loan was forfeited.

---

[6] The Court combines Count I (the Development Fee) and Count II (the Gundaker Loan) because references to Gunapt's rights to the Development Fee generally parallel Gunapt I's rights to repayment of the Gundaker Loan. Notably, payment of the Gundaker Loan was not entitled to repayment *until* the Development Fee and accrued interest were first paid. *See* Doc. [89-11] at 1.  Plaintiffs concede this point. *See* Doc. [95] at 2 n.1.

[7] The Court notes that Defendants did *not* move for summary judgment on Plaintiffs' argument that Defendants breached the contract prior to the March 2018 assignment.  The Court discusses this in detail in Section A(i) of this Memorandum and Order.

In Section (A)(i) of this Memorandum and Order, the Court first addresses whether Defendants' pre-assignment conduct—failing to pay the Development Fee prior to March 2018—amounted to a breach of contract.  Second, the Court considers in Section (A)(ii) whether Defendants validly assigned the Developer Fee away from Gunapt.  The Court denies summary judgment on Counts I and II because questions of material fact remain as to Defendants' pre-assignment conduct and the circumstances surrounding the validity of the assignment itself.

i.  **Failure to Timely Pay Development Fee Prior to 2018 Is Disputed**.

Plaintiffs first base their breach of contract claims on Defendants' failure to timely pay Gunapt the Development Fee *prior to* the 2018 assignment.[8]  Specifically, Plaintiffs claim Defendants failed to make payments on the Development Fee during the 2015 to 2017 time frame—i.e.: before the March 2018 notice was issued—out of the available "Cash Flow."  The Court holds there is a dispute of material fact regarding whether available "Cash Flow" existed to pay the Development Fee prior to the assignment in 2018.

Section 2 of the Development Agreement provides that the Development Fee[9] was to be paid in accordance with the Partnership Agreement.  Doc. [89-5] at 5.  Section 6.1 of the Partnership Agreement provides that a Development Fee was to be paid from the "Development Surplus."[10]  Doc. [89-3] at 45.  But, if any "Development Surplus" was insufficient to pay the Development Fee, the remaining balance of the Development Fee was deferred[11] and to be paid

---

[8] It is undisputed that Gunapt earned the Development Fee.

[9] The Development Fee is defined in Section 2 of the Development Agreement.  Doc. [89-5] at 5.

[10] "Development Surplus" is a defined term in the Partnership Agreement.  *See* Doc. [89-3] at 8.

[11] This reason is why the Development Fee is referred to as a "Deferred Development Fee."

out of "Cash Flow" or when the Project sold.[12]  *Id.*  "Cash Flow" is defined as the excess of "Cash Receipts"[13] over "Cash Expenditures,"[14] two terms that carry complex definitions themselves.  *Id.* at 5.  "Cash Flow shall be determined separately for each fiscal year or portion thereof."  *Id.*  "Cash Flow" is distributed pursuant to Section 9.2(a) of the Partnership Agreement, with the Development Fee being paid sixth.  *Id.* at 55–56.

Here, it is undisputed no "Development Surplus" ever existed, Doc. [89] ¶ 15; thus, the Development Fee at issue here was due out of the "Cash Flow."  Doc. [89-3] at 45.  Plaintiffs presented evidence that there may have been sufficient "Cash Flow" to pay the Development Fee prior to the assignment of the Development Fee in March 2018.  *See* Doc. [94-2] at 78–107 (financial statements from 2015 and 2016); Doc. [94-2] at 108–18 (financial statements from 2017 and 2018).  Defendants have not identified any portions of the record that demonstrate the "Cash Flow" prior to 2018 was insufficient to pay the Development Fee, for example, by showing there was no "Cash Flow" remaining after paying the first five recipients.[15]  Thus, the Court cannot find on this record, as a matter of law, that Defendants had insufficient funds to pay the Development Fee prior to the 2018 assignment.  *Torgerson*, 643 F.3d at 1042 (explaining the moving party must identify those portions of the record that demonstrate the absence of a genuine issue of material fact).

---

[12] Section 9.2(B) of the Partnership Agreement dictates the order in which proceeds from that sale are distributed, and the Development Fee was to be paid eighth.  Doc. [89-3] at 56–57.  The Court notes that this provision would be inapplicable if the SLP properly assigned Gunapt's right to the Development Fee *prior* to the sale of the Project.  However, the Court finds that issue disputed as discussed below in Section A(ii) of this Memorandum and Order.  As such, if the SLP did *not* properly assign the Development Fee, then Gunapt would have been entitled to payment of the Development Fee upon the sale of the Project in the order of priority set out in Section 9.2(B) of the Partnership Agreement.

[13] "Cash Receipts" is a defined term in the Partnership Agreement.  Doc. [89-3] at 5

[14] "Cash Expenditures" is a defined term in the Partnership Agreement.  Doc. [89-3] at 5.

[15] Defendants' only response is that "Plaintiffs have presented no competent evidence that there was available Cash Flow to pay the DDF prior to assignment."  *See* Doc. [100] at 8–9.  The Court disagrees.

ii.   **Proper Assignment of the Development Fee Is Disputed**.

Defendants contend they are entitled to summary judgment on Counts I–II because the SLP properly assigned the Development Fee from Gunapt in 2018.   Defendants' arguments are premised on the theory that (1) the Partnership's failure to make payments in 2009 and 2010 caused "Development Deficits" as defined in the DDGA, (2) Prior GP declined to fund an "Additional Development Deficit Loan," as defined in Section 4.6 of the Partnership Agreement, and (3) Prior GP's failure to fund the deficits triggered the Collateral Agreement, which forfeited repayment of the Gundaker Loan and gave the SLP the right to assign the Development Fee from Gunapt.   For reasons discussed below, disputes of fact remain as to the applicability of these provisions.

a.   *Whether Section 4.6 of the Partnership Agreement Is Applicable*.

Defendants argue Prior GP's failure to fund the "Additional Development Deficit Loans" triggered Section 4.6 of the Partnership Agreement, which invoked the Collateral Agreement. However, Defendants' theory is premised on incorrectly bypassing other necessary provisions of the Partnership Agreement.

According to Section 4.5 of the Partnership Agreement, "[i]f funds in excess of the Gundaker Loan are required to pay Development Deficits, then the Limited Partner or the Special Limited Partner shall make a loan to the Partnership in an amount not to exceed $200,000 for the purpose of funding such Development Deficits (a "Related Development Cost Loan")."  Doc. [89-3] at 30.   Then, pursuant to Section 4.6 of the Partnership Agreement, "[i]f, *after* funding of the Gundaker Loan *and the Related Development Cost Loan*, a Development Deficit *still exists*, then the General Partner may fund such Development Deficit by making an additional loan to the Partnership."[16]  Doc. [89-3] at 30 (emphasis added).   "Such loans shall be termed 'Additional

---

[16] Section 4.6 of the Partnership Agreement further provides that the General Partner may fund the Additional Development Deficit Loans or request the Limited Partner to make such loans.  Doc. [89-3] at 30.

Development Deficit Loans.'"[17]   *Id.*   "If the General Partner declines to fund any such Development Deficit, then the provisions of the Collateral [Agreement] shall apply."  Doc. [89-3] at 30.

While Defendants are correct that Prior GP's failure to fund "Additional Development Deficit Loans" would trigger the Collateral Agreement pursuant to Section 4.6 of the Partnership Agreement, they have failed to show the prerequisite to Section 4.6—i.e.: that the Gundaker Loan and the "Related Development Cost Loan" did not sufficiently fund any "Development Deficit."[18] The Partnership Agreement expressly states that the loans referenced in Section 4.5 must be *insufficient* to cover any "Development Deficits" before Section 4.6 comes into play (which would then trigger the Collateral Agreement).  Defendants put forth no evidence on this point, and if anything, the record currently before the Court places this issue in dispute.  *See, e.g.*, Doc. [94-1] at 5–6 (42:20–43:4) ("After we restructured the project and put in our million dollars, and the bonds were increased to 1.25 million on it, that additional capital covered . . .  [a]nd we were able to complete the developments"); *id.* at 10 (51:16–21); Doc. [89-2] ¶ 48 ("The Limited Partner thereafter loaned the Partnership in excess of $1.7 million to fund the Development Deficit of the Partnership").

b.   ***Whether "Development Deficits" Existed When Prior GP Was General Partner***.

Defendants argue "Development Deficits" existed when Prior GP was the General Partner of Partnership, thus triggering Section 4.6 of the Partnership Agreement and the assignment

---

[17] Notably, "Additional Development Deficit Loans" and "Development Deficit" are different terms with different definitions.  *See* Doc. [89-3] at 2 (defining "Additional Development Deficit Loans" as having the meaning provided in the Section 4.6 of the Partnership Agreement); *id.* at 7 (defining "Development Deficit" as having the meaning provided in the DDGA); Doc. [89-7] at 2 (defining "Development Deficit" in the DDGA).

[18] As the Court explains in more detail below in Section (A)(ii)(b) of this Memorandum and Order, Defendants have not shown, as a matter of law, that "Development Deficits," as used in Section 4.5 of the Partnership Agreement, existed before Prior GP's removal.

10

provision of the Development Fee in Section 2 of the Collateral Agreement.  Plaintiffs dispute any "Development Deficits," to which the Collateral Agreement might apply, existed when Prior GP was the General Partner of the Partnership.

The DDGA[19] defines "Development Deficit" as where "Development Expenditures"[20] exceed "Development Sources,"[21] two terms that carry complex definitions themselves.  *See* Doc. [89-7] at 2.  "Development Expenditures" consist of three categories of Project costs—subsections (a), (b), *and* (c)—that Prior GP[22] was required to pay either through "Completion"[23] or the "Break-Even Date."[24]  *Id.*  Relevant here, subsections (b) and (c) require Prior GP to make loan payments and required deposits for reserves.[25]  *Id.*  As such, these payments and deposits are "Development Expenditures," which is part of the definition of "Development Deficit" in the DDGA.  *Id.*

Defendants argue Prior GP was required to pay these "Development Expenditures" not through the "Break Even Date," but instead, through the date of "Stabilization," which undisputedly did not occur until 2013, Doc. [89] ¶ 22.  Thus, according to Defendants, because the

---

[19] The Partnership Agreement states that "Development Deficit" shall have the meaning provided in the DDGA.  Doc. [89-3] at 7.

[20] "Development Expenditures" are defined in the DDGA.  Doc. [89-7] at 2.

[21] "Development Sources" are defined in the DDGA.  Doc. [89-7] at 2.

[22] Prior GP is named the "Guarantor" of the DDGA.  Doc. [89-7] at 1.

[23] Plaintiffs point to evidence that "Completion" occurred in 2008.  Doc. [94-2] at 2 ¶ 6.  "Competition" has an intricate definition, set forth in the Fourth Contribution Payment Conditions in the Amended and Restated Contribution Agreement, Doc. [94-2] at 22.

[24] "Break-Even Date" is defined as "the last day of the first continuous three-month period of the Project Partnership after Completion during which Break-Even Operations have been maintained by the Project Partnership for each month of such period without any funding required hereunder or under the Operating Deficit Guaranty Agreement by the Guarantor. The occurrence of the Break-Even Date shall be evidenced by an unaudited certification of the Project Partnership's Accountants."  Doc. [89-7] at 1.

[25] Subsection (b) states that "Development Expenditures" consist of "any funds required to be deposited in any reserves."  Doc. [89-7] at 2.  Subsection (c) states that "Development Expenditures" includes "all other Expenses," *id.*, and "Expenses" is defined to include "payment of principal and interest due on any mortgages encumbering the Apartment Complex . . . ."  *Id.*

11

Partnership failed to make monthly loan payments beginning in April 2009 and the required payments for taxes, insurance, and replacement reserves beginning in April 2010, the record shows "Development Deficits" were incurred *before* Prior GP's removal in September 2010 and "Stabilization" in October 2013.

However, Defendants' theory is based on a misinterpretation that Section 4.6 of the Partnership Agreement permanently replaces the term "Break-Even Date" with the term "Stabilization." Instead, Section 4.6 states that the term "Break-Even Date," as used to define "Development Deficit" in the DDGA, will be replaced with the term "Stabilization" *only* "[f]or purposes of [] Section 4.6." Doc. [89-3] at 30. In other words, the term "Break-Even Date" will be replaced with the term "Stabilization" only when the need for "Additional Development Deficit Loans" arises—i.e.: the Gundaker Loan and the "Related Development Cost Loan" do not cover "Development Deficits"[26]—as solely contemplated in Section 4.6. Thus, in all other circumstances (other than where Section 4.6 of the Partnership Agreement applies), a "Development Deficit" occurs when "Development Expenditures"—costs that Prior GP was required to pay either through "Completion" or the "Break-Even Date"—exceed "Development Sources."

As the Court explained in the preceding section of this Memorandum and Order, Section 4.5 of the Partnership Agreement is a prerequisite for Section 4.6 of the Partnership Agreement to take effect. Section 4.5 is only implicated if a "Development Deficit" exists. As just explained, a "Development Deficit," as used in Section 4.5 of the Partnership Agreement, is defined with the term "Break Even Date," *not* "Stabilization." This nuance is important because while Defendants did show Prior GP failed to make loan and reserve payments through the date of "Stabilization,"

---

[26] "Development Deficits" in this context of Section 4.5 of the Partnership Agreement uses the term "Break Even Date" and not "Stabilization."

it has *not* similarly shown that Prior GP failed to make these loan and reserve payments through the "Break Even Date."  The latter is necessary to prove these failures constituted "Development Deficits," as used in Section 4.5 of the Partnership Agreement, which is necessary to trigger Section 4.6 of the Partnership Agreement and the Collateral Agreement.

With all this said, Defendants flawed interpretation precludes summary judgment for two reasons.  First, Defendants have not shown that Prior GP's failure to make payments and reserve deposits occurred through the "Break Even Date," which is necessary to be a "Development Expenditure" under subsection (b) and (c), which is used to define "Development Deficit."  *See* Doc. [89-7] at 2 (defining "Development Deficit" where "Development Expenditures" exceed "Development Sources").  Second, even if Prior GP's failures to pay in 2009 and 2010 were considered "Development Expenditures," Defendants have not shown these "Development Expenditures" exceeded "Development Sources," which is the definition of "Development Deficit,"[27] see *id.*, and necessary to invoke Sections 4.5 and 4.6 of the Partnership Agreement.  As such, the Court cannot find, on this record, as a matter of law, that "Development Deficits" existed when Prior GP was General Partner of the Partnership.[28]

c.     ***Whether Declining to Fund "Additional Development Deficit Loans" Triggers the Collateral Agreement***.

Defendants argue Gunapt is not entitled to the Development Fee because the SLP properly

---

[27] And, at the very least, this issue appears to be disputed.  *See, e.g.*, Doc. [94-1] at 5–6 (42:20–43:4), 10 (51:16–21).

[28] The Court notes that it rejects Plaintiffs' argument that the missed payments were "Operating Deficits" under the separate Operating Deficit Guaranty Agreement, Doc. [94-2] at 3–20, and therefore could not also be "Development Deficits" as referenced in the DDGA.  *See* Doc. [95] at 5–8.  Notably, the DDGA requires Prior GP to pay Project expenses through the "Break-Even Date," and the "Break-Even Date" is defined as a continuous three-month period *after "Completion"* during which "Break-Even Operations" have been maintained by the Project Partnership for each month of such period "without any funding required hereunder *or under the Operating Deficit Guaranty Agreement by the Guarantor*."  Doc. [89-7] at 1–2 (emphasis added).  The DDGA also states that Prior GP agrees to "pay all expenses of *operating* and maintain the Apartment Complex in excess of the gross collections to the extent necessary to maintain Break-Even Operations until the Break-Even Date."  *Id.* at 1 (emphasis added).

assigned the Development Fee in 2018 pursuant to the Collateral Agreement.  Plaintiffs argue the Collateral Agreement could not be invoked in 2018 to assign the Development Fee because New GP, not Prior GP, was the General Partner in 2018 and the assignment must have occurred at the time Prior GP allegedly declined to fund "Development Deficits."

As already discussed, if Section 4.6 of the Partnership Agreement was properly invoked, then the Collateral Agreement applies.  Doc. [89-3] at 30.  According to Section 2 of the Collateral Agreement, "[i]f at any time the General Partner declines to fund any Additional Development Deficit Loan pursuant to Section 4.6 of the Partnership Agreement" then "the Special Limited Partner shall have the right . . . to cause the Developer to assign all of its right, title and interest in and to the Development Fee" within 10-days' notice to the Developer.  Doc. [89-6] at 1–2 (Section 2 and 2(b) of the Collateral Agreement).

Plaintiffs' interpretation of the Collateral Agreement is at odds with the plain language of the document.  The Collateral Agreement makes clear that if two conditions—(1) General Partner declines to fund "Additional Development Deficit Loan" and (2) 10-days written notice[29]—are met, then the Special Limited Partner earns the "right" to assign the Development Fee.  In other words, whenever those two conditions occur, the Special Limited Partner's right to assign the Development Fee vests.  If the drafters of the Collateral Agreement intended the Special Limited Partner's "right" to assign the Development Fee to be within a certain time after the General Partner declined to fund any "Additional Development Deficit Loans," as Plaintiffs so suggest, they could have easily specified so in the document.  They did not do so.

However, summary judgment is precluded here because there are disputes as to whether Section 4.6 of the Partnership Agreement properly applied (which is necessary to trigger the

---

[29] It is undisputed proper notice was provided to Developer.

Collateral Agreement), as discussed in Sections (A)(ii)(a)–(b) of this Memorandum and Order. Also, notably, on this record, there is a dispute as to whether Prior GP was ever requested (and then declined) to fund any "Additional Development Deficit Loan."[30]  *See, e.g.*, Doc. [94-1] at 14 (67:1–4) ("had we been requested to fund any additional development deficit loans we would have, but we [were] never requested and we completed the development"); *id.* at 15 (68:22–29); *id.* at 6 (42:20–43:19).

       d.  ***Whether the 2010 Oral Agreement Changed the Terms of Express Agreements***.

      Plaintiffs argue the 2010 Oral Agreement supersedes the express terms of the Partnership Agreement, Collateral Agreement, and 2010 Amendment.  Specifically, Plaintiffs argue the 2010 Oral Agreement was made where Prior GP would agree to step down as General Partner of the Partnership and, in exchange, Gunapt retained its right to the Development Fee and the Gundaker Loan would remain payable to Gunapt I, notwithstanding contrary provisions in the Partnership Agreement and Collateral Agreement.  Plaintiffs admit there are no written agreements that reflect the 2010 Oral Agreement.

      For several reasons Plaintiffs argument fails.  Most notably, the parol evidence rule plainly prohibits evidence of the alleged 2010 Oral Agreement.  *Rosenfeld v. Boniske*, 445 S.W.3d 81, 87 (Mo. Ct. App. 2014) ("In the absence of fraud, accident, mistake or duress, the parol evidence rule prohibits evidence of prior contemporaneous oral agreements that vary or contradict the terms of an unambiguous, final, and complete writing.").  As such, the Court concludes that the 2010 Oral Agreement does not change the terms of the express agreements, such as the Partnership

---

[30] The Court notes that failure to cure breaches of, for example, the DDGA, is different than declining to fund any "Additional Development Deficit Loan," as meant (and defined) in Section 4.6 of the Partnership Agreement.  Rather, the issue is whether "Development Deficits," as defined in the DDGA, existed at the time Prior GP was General partner, as to trigger Section 4.5 of the Partnership Agreement, which is a necessary prerequisite to trigger Section 4.6 of the Partnership Agreement and then the Collateral Agreement.

Agreement, Collateral Agreement, or 2010 Amendment.

B. **Unjust Enrichment (Count IV)**

Gunapt asserts a claim for unjust enrichment against all Defendants (except Alden Torch) on the basis that Gunapt provided services as Developer of the Project with the expectation Gunapt would be paid the Development Fee.  Doc. [48] at 10–12; Doc. [73] at 2.

Defendants are correct that Gunapt cannot recover under an unjust enrichment theory under Missouri law when it "has entered into an express contract for the very subject matter for which [it] seeks to recover."  *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014); *Steelhead Townhomes, L.L.C. v. Clearwater 2008 Note Program, LLC*, 537 S.W.3d 855, 860 (Mo. Ct. App. 2017) ("[I]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract."); *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 955–56 (8th Cir. 2016) (acknowledging "Missouri law does not allow a plaintiff to maintain an action for either of these quasi-contract remedies when an express contract governs the subject matter for which recovery is sought").  Here, there are express contracts—ones that form the basis of Gunapt's claim in Count I—which govern entitlement to and distribution of the Development Fee.  Thus, unjust enrichment does not apply.  Gunapt is "not entitled to an equitable remedy simply because [Defendants] took actions under the contract[s] that [Gunapt] did not like." *See Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 465 (Mo. Ct. App. 2020) (upholding lower court's dismissal of unjust enrichment claim where "contract explicitly permitted" the defendants' conduct).  Moreover, Plaintiffs' argument that some Defendants did not sign the contracts governing the Development Fee is immaterial—the sole inquiry is whether *Gunapt* "entered into an express contract for the very subject matter for which [it] seeks recovery." *R &*

16

*R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. Ct. App. 2012).  Gunapt did.  As such, the Court grants summary judgment in favor of Defendants on Count IV.

    C.  **Tortious Interference (Count VI)**

    Gunapt asserts a tortious interference with contract and/or business expectancy against LP, SLP, New GP, and Manager for causing the Partnership to breach the (1) Development Agreement, (2) Partnership Agreement, and (3) 2010 Oral Agreement.  Doc. [48] at 13–14.  In arguing entitlement to summary judgment, Defendants assert that (1) Gunapt had no legal interest in the Development Fee after it was assigned and (2) all Defendants were parties to the contracts and, as parties, they cannot tortiously interfere with those contracts.

    As to the first argument, the Court already held in Section A of this Memorandum and Order, that genuine issues of material fact remain as to whether the Development Fee was validly assigned in March 2018 or whether the SLP had "an absolute right" to make the assignment.

    As to the second argument, the Court agrees with Defendants that Gunapt cannot assert a tortious interference claim against a defendant who is a party to that contract.  *See, e.g.*, *Jurisprudence Wireless Commc'ns, Inc. v. CyberTel Corp.*, 26 S.W.3d 300, 302 (Mo. Ct. App. 2000) (explaining cause of action for tortious interference is premised on the tortious behavior of a defendant *not* a party to the contract).  But, the SLP is the only named Defendant in Count VI that is a party to all three Agreements.  *See* Doc. [89-5] at 1 (Development Agreement naming SLP as party); Doc. [89-3] at 1 (Partnership Agreement naming SLP as party); Doc. [94] ¶ 9 (citing to Doc. [94-1]) (Deposition of Michael Hejna where he explains that he, on behalf of Gunapt and Gunapt I, and Andrew Weil, on behalf of Related, had oral agreement, known as the 2010 Oral Agreement).[31]  In direct contrast, Manager is not a party to any contract subject to Count VI.  Also,

---

[31] It is unclear from the record whether Andrew Weil was also acting on behalf of LP, Manager, or New GP.

both LP and New GP are parties only to the Partnership Agreement.[32]  *See* Doc. [89-3] at 1 (Partnership Agreement naming LP as party); Doc. [89-4] (2010 Amendment to the Partnership Agreement adding New GP as General Partner).  Accordingly, the Court grants summary judgment in favor of SLP on Count VI but denies summary judgment as to Manager, New GP, and LP.[33]

### D.  **Constructive Trust (Count V)**

Plaintiffs assert a claim for constructive trust against all Defendants.  The most compelling argument Defendants put forth for summary judgment on this count is that Plaintiffs cannot meet their burden of identifying the *res*—here, the Development Fee—with required specificity, thus rendering the remedy of a constructive trust unavailable.  Doc. [88] at 21.  The Court agrees.

The "very essence" of the remedy of a constructive trust is the "identification of specific [] funds as the res upon which the trust may be attached."  *Ralls Cty. Mut. Ins. Co. v. RCS Bank*, 314 S.W.3d 792, 795 (Mo. Ct. App. 2010).  Here, Plaintiffs have pointed to no evidence with which it could meet its burden to establish the identifiable funds as the *res* upon which a constructive trust could be attached.  *Celotex Corp.*, 477 U.S. at 325.  While it is true Plaintiffs identified the *res* (the Development Fee) and traced the *res* (into the Manager's operating account),[34] Plaintiffs do not show that the *res* might *still* be in the operating account.  To the contrary, Defendants put forth evidence that upon transfer of the Development Fee into the Manager's operating account, the money was comingled with pre-existing funds as well as funds deposited after the fact during the past four years.  That account has been used "to pay expenses and distributions to investors," Doc.

---

[32] Defendants have not shown that being a party to the Partnership Agreement similarly means you are a party to the Development Agreement, and language in the Development Agreement shows otherwise.  *See, e.g.*, Doc. [89-5] at 6 ("This Agreement shall be binding upon the parties hereto" and "may not be assigned").

[33] The Court notes that New GP's and LP's liability in Count VI can only come from tortious interference with contracts to which they were not parties.

[34] After the Project was sold and the funds were distributed, the New GP received the portion of the Development Fee that could be paid, and those funds were then immediately transferred into the operating account of the Manager.

[89-2] ¶ 62, and "[t]here ha[s] been more than several hundred transactions involving money flowing in and out of the account since [New GP] transferred [the Development Fee] to the [Manger's] account," Doc. [94-3] at 2.  As such, it "became impossible to distinguish, trace[,] or identify funds that were once proceeds from the sale of the Project, including the funds used to pay a portion of the" Development Fee.  Doc. [89] ¶¶ 67–70.  Given the commingling of money into a single account at different times from which additional monies were disbursed at different times, it cannot be said that the monies in existence in the Manager's account in 2018 and the monies currently in existence now are the same identifiable funds.  Because Plaintiffs have not pointed to any evidence that the funds currently held in the Manager's operating account are the same dollars or traceable to the same dollars that were in the account when the Development Fee was deposited in 2018, Plaintiffs constructive trust claim fails.  *See Ralls*, 314 S.W.3d at 797 (explaining identification of the specific res is essential in establishing a constructive remedy); *see also Guidry v. Seven Trails W., LLC*, 4:12-cv-1652-FRB, 2013 WL 12328066, at *4 (E.D. Mo. Aug. 27, 2013) (finding attempt to add constructive trust remedy under similar facts to be futile because there was no way to trace money once commingled years prior).

E.  **Civil Conspiracy (Count VII)**

Defendants only argument as to why they are entitled to summary judgment on Plaintiffs' civil conspiracy claim is "[i]n Missouri, if the underlying conduct alleged as elements of a civil conspiracy claim 'fail to state a cause of action, then the conspiracy claim fails as well.'"  Doc. [88] at 24.  For reasons already discussed, genuine disputes of material fact remain as to Defendants underlying conduct; thus, the Court will not dismiss Plaintiffs' conspiracy claim or undergo a separate analysis.  *Cf. Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008) ("If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of

action, the civil conspiracy claim fails as well.").

### F.  **Accounting (Count III)**

Plaintiffs assert a claim for accounting against all Defendants, which rests on the 2018 sale of the Project and subsequent distribution of the proceeds.   Defendants move for summary judgment on Count III and provide several arguments to support their motion.  Doc. [88] at 17–19.   Plaintiffs provided *no* response on this matter.   "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."   *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009); *SL EC, LLC v. Ashley Energy, LLC*, 561 F. Supp. 3d 802, 819 (E.D. Mo. 2021) (finding "Plaintiffs have abandoned [their] claim by entirely failing to address it in their response to Defendants' motion for summary judgment").   Plaintiff's abandonment of this claim entitles Defendants to summary judgment on it.

### CONCLUSION

The Court denies summary judgment for breach of contract (Counts I–II) and civil conspiracy (Count VII) because genuine disputes of material fact remain.   The Court grants summary judgment on Gunapt's claim for unjust enrichment (Count IV) because the Development Fee is governed by express contracts.  The Court grants summary judgment on Plaintiffs claim for constructive trust (Count V) because they have not shown the Development Fee is still in the Manager's operating account.   The Court grants summary judgment on Plaintiffs' claim for accounting (Count III) because Plaintiffs failed to respond to Defendants' arguments on that point. Finally, the Court grants summary judgment in favor of the SLP on Gunapt's claim for tortious interference (Count VI), because the SLP was a party to the contracts with which it allegedly tortiously interfered but the Court denies summary judgment for all other Defendants named in Count VI.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [87],

is **DENED in part** and **GRANTED in part** consistent with this Memorandum and Order.

Dated this 16th day of November, 2022.

_____

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE